UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL FISCHER, | No. 2:12-cv-2595 MCE CKD P |
| Plaintiff, | |
| v. | ORDER AND |
| DAWN T. ALGERS, et al., | FINDINGS AND RECOMMENDATIONS |
| Defendants. | |

I. Introduction

Plaintiff, a state prisoner proceeding pro se, has filed this civil rights action seeking relief under 42 U.S.C. § 1983. This action proceeds on the First Amended Complaint filed January 31, 2013, in which plaintiff alleges that three defendants at Mule Creek State Prison were deliberately indifferent to his serious medical needs by failing to provide him with adequate pain medication after surgery on his shoulder. (ECF No. 15 ("FAC").) Pending before the court is defendants' December 13, 2013 motion for summary judgment (ECF No. 39), which has been briefed by the parties (ECF Nos. 44, 45). For the reasons discussed below, the undersigned will recommend that defendants' motion be granted.

II. Summary Judgment Standards Under Rule 56

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. . ." Fed. R. Civ. P. 56(c)(1)(A).

Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

III. Analysis

A. Facts

In determining whether summary judgment is appropriate, the court considers the following record facts:

Plaintiff's Care

Plaintiff underwent a reconstructive surgical procedure on his left shoulder on February 27, 2012, while incarcerated at California Men's Colony (CMC). (DUF 1.) A metal hook and plate assembly was left in place until the site healed, causing ongoing pain.[1] (FAC ¶ 11.) When plaintiff's prescription for morphine expired in early March 2012, nondefendant CMC medical staff refused to extend it. Instead, he was prescribed Tylenol 3 with codeine three times per day, "which was just enough to keep the severe pain away." (DUF 2; FAC ¶ 12.)

Plaintiff was transferred to Mule Creek State Prison (MCSP) on March 9, 2012. (DUF 3.) At the time of the transfer, he was taking Tylenol 3, amitriptyline, and non-prescription ibuprofen for left shoulder pain. (DUF 4.) Plaintiff was taking additional non-narcotic medications for low back pain and right knee pain. (DUF 5-6.)

Defendant Todd was a Physician's Assistant at the B-yard clinic at MCSP. On March 16, 2012, plaintiff, still in "moderate pain" due to the metal implants in his shoulder, requested that his pain medication be changed from Tylenol 3 to Tylenol 4. (FAC ¶¶ 13-14.) Todd reviewed plaintiff's medical records and was aware of his current prescriptions for pain management. (DUF 7-8.) She did not provide Tylenol 4, a stronger narcotic pain medication, because in her medical judgment, this would go against the advice of the California Prison Health Care Services (CPHCS) Pain Management Guidelines.[2] As of March 16, 2012, plaintiff had been taking Tylenol 3 for nearly three weeks after his shoulder surgery. (DUF 9.) Todd recommended that plaintiff continue with Tylenol 3 for five days only, then start a course of non-steroidal anti-

---

[1] A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence. Lopez v. Smith, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000).

[2] See Def. Ex. G, ECF No. 39-4, discussed below.

3

inflammatory medication, reasoning that a reduction in the level of inflammation in the left shoulder would result in a decrease in pain. (DUF 11.)

Plaintiff alleges that Todd never examined him, nor inquired as to "the actual level of pain, or for how long . . . the pain had been increasing." (FAC ¶ 15.) Plaintiff alleges that Todd left orders with the pill line nurses that plaintiff's dosage of Tylenol 3 be reduced from three pills per day to two pills per day, causing plaintiff's pain to worsen, "hurting severely when making unguarded movements[.]" (FAC ¶ 17.)

Defendant Clark-Barlow was a Nurse Practitioner on the B-Yard clinic at MCSP. On March 23, 2012, after the prescription for Tylenol 3 expired, plaintiff returned to the clinic, told defendant Clark-Barlow he was in pain, and requested an additional prescription of Tylenol 3, which Clark-Barlow refused. (DUF 12.) Instead, Clark-Barlow prescribed Motrin, a non-narcotic pain medication. Plaintiff also was taking aspirin and amitriptyline for pain relief. (DUF 13-14.)

The Motrin did not "eliminate or even reduce" plaintiff's pain. Rather, the pain "became so severe that it was waking him up at night if he rolled onto his shoulder, and he was having problems dressing himself, as it was extremely painful . . . to lift his left arm over his head." (FAC ¶¶ 19-20.)

On April 12, 2012, an outside physician, Dr. Pucelik, examined plaintiff to follow up on his left shoulder surgical procedure. Plaintiff asserts that, during this period, he was experiencing severe pain that was interfering with his sleep and daily functioning. (Plff. Decl., ECF No. 44-4 at ¶¶ 3-5.) However, Dr. Pucelik's chart note stated that plaintiff's "wound looks good at the present time, and clinically he is doing fine. He only has mild pain." The chart note further stated that X-rays showed the shoulder joint and the surgical hardware were in good position and that plaintiff was to begin range-of-motion exercises. (Def. Ex. D., ECF No. 39-3 at 36.) Subsequently, defendants Galloway, Todd, and Clark-Barlow each reviewed this chart note and relied on Dr. Pucelik's findings. (DUF 17.)

Five days after his examination by Dr. Pucelik, plaintiff returned to the B-Yard clinic "in severe shoulder pain as the Motrin was not an effective pain reliever[.]" (FAC ¶ 21.) Dr.

Galloway, a physician at the B-Yard clinic, examined plaintiff. (FAC ¶ 7; DUF 19.) Concerned that plaintiff may have developed an infection at the surgery site and/or that the hardware in plaintiff's shoulder had shifted, Dr. Galloway ordered tests on these issues. Pending the results of the tests, Dr. Galloway prescribed plaintiff Tylenol 3 with codeine for the period of one week. (DUF 19.) This greatly reduced plaintiff's pain, improving his ability to sleep and dress himself. (FAC ¶ 22.)

The test results ruled out an infection and confirmed that plaintiff's shoulder hardware remained in place. (DUF 20.) Dr. Galloway concluded that the use of Tylenol 3 or other narcotic pain medication was not warranted for more than one week in plaintiff's case, because of the associated risks and because such medication is prescribed only for short periods of time unless an identifiable source of persistent and significant pain exists. (DUF 21.) Plaintiff alleges that, after his one-week supply of Tylenol 3 ran out, he was again in "intense and severe pain" that interfered with his sleep and daily activities. (FAC ¶ 23.)

On April 25, 2012, plaintiff was seen at the B-Yard clinic by defendant Clark-Barlow, who refused his request for Tylenol 3 "without an exam or any inquiries as to the level of pain or range of motion in plaintiff's shoulder." (FAC ¶ 24.) Instead, Clark-Barlow recommended a prescription of acetaminophen to reduce the inflammation in plaintiff's shoulder. Clark-Barlow also recommended a prescription of methocarbamol, a muscle relaxer, in order to address pain resulting from muscle spasms in the shoulder. (DUF 23.)

In early May 2012, plaintiff was seen at the B-Yard clinic by defendant Todd. He was still in "severe shoulder pain" and again requested a prescription for Tylenol 3. (FAC ¶ 27.) Todd declined this request because the wounds from plaintiff's first shoulder surgery had healed, Dr. Pucelik's chart note indicated only mild pain, x-ray reports indicated that the hardware in his shoulder remained in proper position, and the possibility of an infection in the shoulder had been ruled out. In Todd's judgment, plaintiff's pain was sub-acute. To reduce it, Todd recommended Elavil and increased the dosage of amitriptyline. Todd understood that plaintiff was also taking ibuprofen for pain. In Todd's judgment and in light of the CPHSC Pain Management Guidelines, exposing plaintiff to the risks of continued narcotics was not in his best interest. (DUF 24.)

On June 18, 2012, plaintiff spoke to a non-defendant nurse in B-Yard clinic about his attempt to obtain Tylenol 3 for his continued pain. "The nurse on duty called the staff physical therapist, . . . and he agreed that plaintiff was in severe pain. The nurse then contacted Dr. Galloway" concerning plaintiff's complaints of left shoulder pain. (FAC ¶ 29.) Galloway was aware that plaintiff had been undergoing physical therapy treatments on his left shoulder and that the chart notes suggested the possibility that the shoulder joint was inflamed. The nurse offered treatment to reduce the inflammation and the attendant pain. Plaintiff declined this medication, and the appointment with his primary care provider was advanced to address his complaint of pain. Plaintiff's medical records show that, as of this date, he was taking acetaminophen and reporting that the other medications were ineffective to address his pain. (DUF 25.)

On August 9, 2012, plaintiff was sent to a hospital to have the metal hook and plate removed from his left shoulder. The hospital put plaintiff on Percocet for pain and, when he returned to MCSP, he was prescribed Tylenol 3, which effectively controlled his pain until the incision site healed two weeks later. (FAC ¶ 32.)

Plaintiff declares that, from March 16, 2012 until August 9, 2012, he was in severe pain which rendered him unable to sleep and was "barely able to function." (Plff Decl., ECF No 44-4 at ¶¶ 6, 19.) He believes the pain was due to the "hook and plate assembly rubbing on tendons and other soft tissues." (Id. At ¶ 21.) At weekly physical therapy appointments throughout May and June 2012, plaintiff told the physical therapist the pain was worsening; he believes Clark-Barlow was "aware of this situation." (Id. at ¶ 17.) In April 2012, plaintiff filed an inmate health care appeal seeking more effective pain relief, which he pursued through all three levels of administrative review. (FAC at 15-24.)

Defendants Galloway, Todd, and Clark-Barlow declare that they intended to address the condition of plaintiff's left shoulder and his complaints of pain without unnecessarily exposing him to risks associated with the use of narcotic pain medication, as spelled out in the CPHCS Pain Management Guidelines. They further declare that they were unaware of any risks of serious medical harm to plaintiff that would result from the use of non-narcotic pain medication, rather than narcotic medication. (DUF 28.)

Pain Management Guidelines

Both plaintiff and defendants cite the CPHCS Pain Management Guidelines in support of their positions. (Def. Ex. G, ECF No. 39-4.) Plaintiff characterizes his pain as "chronic" under the Guidelines, warranting long-term opioid use. (See ECF No. 44-3 at 3-4.)

The Guidelines are intended to "provide the CPHCS clinician a standardized framework to address the problem of pain in their patients . . . [for] both acute and chronic pain." (ECF No. 39-4 at 12.[3]) Acute pain is defined as generally lasting less than 30 days and stemming from injury or disease; it warns of "tissue damage." (Id. at 9, 13.) In contrast, chronic pain is defined as pain that persists for more than 30 days and is not directly linked to an injury or illness. (Id. at 10.)

For acute pain, the Guidelines counsel to "consider opioid use" for severe pain with objective evidence of injury or inflammation.[4] (Id. at 9.) If a patient is experiencing a moderate level of acute pain and there is a "specific diagnosis with objective findings," the Guidelines recommend Tylenol 3 with codeine as a "the preferred 'weak' opioid of choice." (Id. at 43-44.) A prescription for Tylenol 3 for acute pain is "restricted to a 10 day supply." (Id. at 9.) "Opioids for acute pain are indicated for short term use only. If patient reports needing continued opioid after expected healing of pain condition (generally <30 days)," the clinician is to "refer to" the Guidelines. (Id. at 42.)

For chronic pain, the Guidelines advise clinicians to "[c]onsider opioid use if patient is unresponsive to non-opioid analgesics and adjuvant medications and has severe pain persisting for >30 days with impaired function [or] ongoing evidence of severe disease." (Id. at 10-11.) If opioids are required for management of chronic pain, the preferred agents are methadone and morphine. (Id. at 11.) "If patient has an occasional flare of his or her chronic pain, a short acting opioid such as Tylenol 3 . . . can be used for short periods, generally less than 14 days and not [to]

---

[3] Citations refer to page numbers assigned by the court's docketing system.

[4] Opiates are "naturally occurring alkaloids, such as morphine from the opium poppy seed. Opioid is the term used broadly to describe all compounds that exert activity at the opioid receptor. " (Id. at 23.)

7

exceed 30 days." (Id.)

The Guidelines list several reasons why "some clinicians have been hesitant to prescribe opioids" to non-cancer patients with pain, including "known adverse effects of opioid therapy," the potential for addiction, "complexity of having to write monthly prescriptions for controlled substances," and "lack of belief in patient's subjective reports of pain." (Id. at 23.) The Guidelines document the risks and adverse effects of opioid use. (Id. at 26-32.) They advise, however, that "[i]f the patient has demonstrated substantial improvement in both function and reported pain levels, reasonable doses of opioids could continue." (Id. at 31.)

B. Legal Standard

Denial or delay of medical care for a prisoner's serious medical needs may constitute a violation of the prisoner's Eighth and Fourteenth Amendment rights. Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). An individual is liable for such a violation only when the individual is deliberately indifferent to a prisoner's serious medical needs. Id.; see Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002); Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000).

In the Ninth Circuit, the test for deliberate indifference consists of two parts. Jett, 439 F.3d at 1096. First, the plaintiff must show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Id., citing Estelle, 429 U.S. at 104.

Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. Jett, 439 F.3d at 1096. This second prong is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. Id. Under this standard, the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person "must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). This "subjective approach" focuses only "on what a defendant's mental attitude actually was." Id. at 839.

A showing of merely negligent medical care is not enough to establish a constitutional violation. Frost v. Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998), citing Estelle, 429 U.S. at 105-

106. A difference of opinion about the proper course of treatment is not deliberate indifference, nor does a dispute between a prisoner and prison officials over the necessity for or extent of medical treatment amount to a constitutional violation. See, e.g., Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). Furthermore, mere delay of medical treatment, "without more, is insufficient to state a claim of deliberate medical indifference." Shapley v. Nev. Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). Where a prisoner alleges that delay of medical treatment evinces deliberate indifference, the prisoner must show that the delay caused "significant harm and that Defendants should have known this to be the case." Hallett, 296 F.3d at 745-46; see McGuckin, 974 F.2d at 1060.

C. Discussion

Defendants assert that plaintiff has failed to establish a genuine dispute of material fact as to whether they were deliberately indifferent to plaintiff's serious medical needs. Drawing all reasonable inferences in plaintiff's favor, the court summarizes the record facts as follows:

After undergoing surgery on his shoulder in February 2012, plaintiff was briefly prescribed morphine and then, in early March, Tylenol 3 with codeine. The metal implants in his shoulder, to be left in place for several months until the site healed, continued to cause him pain above and beyond the usual post-surgical pain. After taking Tylenol 3 for nearly three weeks, he asked Todd for Tylenol 4, a stronger pain medication. Without examining him or inquiring into his pain level, Todd declined and instead gave orders to taper down plaintiff's Tylenol 3 prescription.

On March 23, after his Tylenol 3 ran out, plaintiff sought a refill from Clark-Barlow, who instead prescribed Motrin. On Motrin, plaintiff's pain became so severe that it woke him up at night and made it difficult for him to dress, as it was extremely painful to lift his arm. However, at an April 12 appointment, an outside physician made chart notes stating that plaintiff's pain was "only . . . mild" and that his wound was healing well.

Five days later, when plaintiff complained of severe pain to Dr. Galloway and asked for Tylenol 3, Galloway prescribed a week's worth of Tylenol 3 and ordered tests to determine whether his wound was infected and whether his shoulder hardware remained in place. The

9

Tylenol 3 temporarily addressed plaintiff's pain. The test results showed nothing wrong.

When the Tylenol 3 ran out, plaintiff's extreme pain returned, and on April 25 he asked Clark-Barlow to renew his prescription. Without examining plaintiff or inquiring about his level of pain or range of motion in his shoulder, Clark-Barlow declined and instead prescribed acetaminophen and a muscle relaxer. These medications did not effectively control plaintiff's pain.

In May and June, plaintiff continued to request stronger pain medication, specifically Tylenol 3. On separate occasions, Todd and Galloway declined this request, relying on the outside doctor's chart notes of "mild pain" and plaintiff's recent tests results, and cognizant of the risks associated with continued narcotics use. During this period, plaintiff was prescribed various non-opioid medications to control his pain and any inflammation at the surgical site. None were effective in relieving his severe pain, however. Plaintiff was also undergoing weekly physical therapy for his shoulder. His physical therapist agreed that his condition was very painful.

Plaintiff's severe pain and impaired daily functioning continued until August 9, 2012, when the metal implants in his shoulder were surgically removed and his post-surgical pain was adequately treated.

In Jackson v. McIntosh, 90 F.3d 330, 333 (9th Cir. 1996), the Ninth Circuit held that

> where a defendant has based his actions on a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference, as a matter of law. To prevail under these principles, [plaintiff] must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, . . . and the plaintiff must show that they chose this course in conscious disregard of an excessive risk to plaintiff's health.

(Internal citations omitted.) "[A] plaintiff's showing of nothing more than 'a difference of medical opinion' as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference." Id.; see Toguchi, 391 F.3d at 1058.

Here, the record on summary judgment demonstrates that the course of treatment chosen by defendants Galloway, Todd, and Clark-Barlow was medically acceptable under the circumstances. Under the CPHCS Guidelines, plaintiff's condition was similar in some aspects to

"acute" pain, for which Tylenol 3 is restricted to a 10-day supply. To the extent plaintiff's condition was a form of "chronic" pain – i.e., lasting more than 30 days – the Guidelines recommend Tylenol 3 for "short periods, generally less than 14 days and not [to] exceed 30 days." By the time plaintiff first asked a defendant (Todd) for stronger pain medication, he had been on Tylenol 3 for almost three weeks after surgery. Defendants were reluctant to expose plaintiff to the risks associated with the prolonged use of opioid-based medication. Thus, instead of continuing to prescribe Tylenol 3 for months while plaintiff's shoulder hardware remained in place, they prescribed various non-opioid pain medications. In doing so, they relied on test and examination results indicating that plaintiff's wound was not infected, his shoulder hardware remained in place, and he was clinically "doing fine." Defendants prescribed medications to address multiple potential causes of plaintiff's pain, including inflammation, muscle spasms, and neuropathic pain.

Certainly, in light of plaintiff's reports of ongoing severe pain and the effectiveness of Tylenol 3 in addressing his pain, defendants could have kept him on a "reasonable dose" of Tylenol 3 for longer than they did. However, on this record it cannot be said that defendants' decisions were "medically unacceptable." As plaintiff has failed to show deliberate indifference as a matter of law, the undersigned will recommend that defendants' motion for summary judgment be granted.

After the parties briefed the summary judgment motion, plaintiff filed a motion seeking to settle this case. (ECF No. 47.) The undersigned will deny plaintiff's motion without prejudice to renewal if the district court does not grant summary judgment as to all defendants.

Accordingly, IT IS HEREBY ORDERED that plaintiff's motion to settle the case (ECF No. 47) is denied without prejudice.

IT IS HEREBY RECOMMENDED that defendants' motion for summary judgment (ECF No. ) be granted, and this action be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: July 9, 2014

                                                                                   */s/ Carolyn K. Delaney*
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

2 / fisc2595.sj